Case No.  3:17CV2059 (MPS)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

---

ALEX SALVAGNO,

Petitioner,

v.

WARDEN D.K. WILLIAMS, FCI DANBURY

Respondent.

---



FILED
2017 DEC 11 A 9: 13
US DISTRICT COURT
HARTFORD CT

## MEMORANDUM IN SUPPORT OF
## PETITION FOR A WRIT OF HABEAS CORPUS
## UNDER 28 U.S.C. § 2241

---

Alexander Salvagno, 11212-052
Pro Se
Federal Correctional Institution
33½ Pembroke Road
Danbury, Ct 06811

# TABLE OF CONTENTS

PROCEDURAL HISTORY ................................................1

WHY THE § 2255 REMEDY IS INADEQUATE OR INEFFECTIVE .............2

WHY THE ISSUE PRESENTED HEREIN WAS NOT RAISED ON APPEAL .......10

WHY THE ISSUE IS NOT OTHERWISE PROCEDURALLY BARRED ...........10

HABEAS GROUNDS

   Salvagno's Sentence Violates Due process Because The Sentencing
   Court Acted On Information That Years Later Turned Out to Be
   Materially Untrue ...........................................11

RELIEF SOUGHT ................................................28

CONCLUSION ...................................................30

VERIFICATION .................................................30

Alex Salvagno, Plaintiff, submits this memorandum in support of his petition for a writ of habeas corpus under 28 U.S.C. § 2241 (the "Petition").

## Procedural History

1.  Salvagno was convicted after jury trial for various charges related to the operation of his asbestos abatement company.  On December 23, 2004, the United States District Court for the Northern District of New York sentenced him to a term of 300 months imprisonment after increasing his United States Sentencing Guidelines (USSG) range by nine levels under USSG § 2Q1.2(b)(2).  Section 2Q1.2(b)(2) enhances a defendant's offense level "[i]f the offense resulted in a substantial likelihood of death or serious bodily injury."

2.  Salvagno's conviction and sentence were affirmed on appeal by the Second Circuit, United States v Salvagno, 343 Fed. Appx 702 (2nd Cir 2009).  His habeas motion under 28 U.S.C. § 2255, filed in the sentencing court on July 2, 2011, was denied on the merits. USDC NDNY 02-cr-51, (Dkt## 879 & 1026).

3.  On February 27, 2017, Salvagno filed a prior § 2251 petition ""Prior Petition") in this Court. USDC D.Ct, 17-cv-318 (Dkt# 1).

4.  The Prior Petition challenged, inter alia, the rulemaking and decision of the Bureau of Prison ("BOP") related to its denial of Salvagno's 2015 request to file a reduction in sentence ("RIS") motion under 18 U.S.C. § 3582(c)(1)(A)(i), for extraordinary and compelling reasons,

based on his wife's passing and need to care for their three minor children. Id.

5. On November 9, 2017, the Court issued a judgment dismissing the Prior Petition after finding it lacked authority to review Petitioner's claims against the BOP.

6. The instant Petition challenges, inter alia, the sentencing court's 2006 imposition of his sentence, which is a different determination than that challenged in the Prior Petition.

7. Salvagno believes that Rule 2(e), of the habeas rules, requires him to bring the instant Petition as a separate habeas petition. See 28 U.S.C. § 2254, Rule 2(e), made applicable to §§ 2241 petitions through habeas Rule 1(b).

Why The § 2255 Remedy Is Inadequate Or Ineffective

A. Relevant Standard.

8. "[A]s a general rule, federal prisoners must use § 2255 instead of § 2241[] to challenge a sentence as violating the Constitution or laws of the United States"; however, where § 2255 "provide an inadequate or ineffective remedy," a prisoner may file a §2241 motion challenging the imposition of their sentence. Jiminian v Nash, 245 F.3d 144, 147 (2nd Cir 2001).

9. A remedy is "inadequate or ineffective in circumstances in which the petitioner cannot, for whatever reason, utilize § 2255, and in which the failure to allow for

collateral review would raise serious constitutional questions." Id. (internal quotations and citations omitted).

10. "Serious constitutional questions would arise if a person can prove his actual innocence on the existing record-and who could not have effectively raised his claim of innocence at an earlier time-had no access to judicial review." Triestman v. United States, 124 F.3d 361, 363 (2nd Cir 1997). See also Love v Menifee, 333 F.3d 69, 73 (2nd Cir 2003)("[S]erious constitutional questions' are not raised when AEDPA prevents a prisoner from raising a claim that he or she could have raised on direct review or in an earlier section 2255 motion.")(quoting Jiminian, 245 F.3d at 147-148); Hickman v Nash, 8 Fed. Appx 59, 60 (2nd Cir 2001)("Because Hickman does not assert that he is actually innocent and could have raised the [claim] on direct appeal or in a timely § 2255 petition, he has failed to show that his case raises serious constitutional questions").

11. In Triestman, the Second Circuit found the first criterion met because Triestman previously had a § 2255 motion dismissed on the merits and his actual innocence claim satisfied neither of the AEDPA's gate-keeping requirements for second or successive § 2255 motions. 124 F.3d at 372. It also found the second criterion met, holding that because Triestman could not have raised his actual innocence claim in his initial §2255 motion, "serious Eighth Amendment and due process questions would arise" if Triestman were foreclosed from seeking collateral review on his actual innocence claim. Id. at 380.

12. The Second Circuit has held that the actual

innocence exception may apply to sentencing enhancements. Spence v Superintendent, Great Meadows Corr. Facility, 219 F.3d 162, 170-72 (2nd Cir 2000). To demonstrate actual innocence in this context, the petitioner must show "by clear and convincing proof that he is actually innocent of the conduct on which his sentence is based." Spence, 219 F.3d at 172. "[T]he actual innocence inquiry will focus on the reliability of those facts which make defendant eligible for a harsher sentence ..." Id. Thus, the actual innocence exception extends not only to the underlying crime, but to other conduct considered by the Court during the sentencing phase of a noncapital case where that conduct serves as a basis for increasing the sentence. Id. See also Pointdexter v Nash, 333 F.3d 372, 380-83 (2nd Cir 2003).

B. Argument

13. Salvagno claims he is actually innocent of the conduct, which the sentencing court relied on to find his "offense resulted in a substantial likelihood of death or serious bodily injury" to his workers, to enhance his sentencing range by nine levels under USSG § 2Q1.2(b)(2).

14. In particular, he alleges that new evidence (when considered in light of all of the evidence in the record) clearly and convincingly demonstrates that no reasonable finder of fact would have determined his offense created the requisite fiber count of airborne asbestos exposures (intensity, frequency and duration) necessary to "result in a substantial likelihood of death or serious bodily injury" to

his workers.

15. By challenging the determination of his responsibility for the conduct predicating his enhanced sentence, Salvagno raises precisely the question that the actual innocence exception contemplates.

16. Salvagno's actual innocence claim fits within the Triestman exception that permits a prisoner to petition under § 2241 to test the legality of his detention when § 2255 is inadequate or ineffective. Triestman, 124 F.3d at 377.

17. Triestman's first criterion is met because Salvagno's prior § 2255 motion was dismissed on the merits and his actual innocence claim does not satisfy the AEDPA's gate-keeping requirements for second or successive § 2255 motions.

18. Triestman's second criterion is also met because Salvagno could not have raised his actual innocence claim on direct appeal or in his prior §2255 motion, and serious Eighth Amendment and due process questions would therefore arise if he were foreclosed from seeking collateral review of his actual innocence claim.


C. Supporting Facts.


i. Actual Innocence


19. At sentencing, court relied on the information provided by the government - i.e., that 100 of Salvagno's workers who worked for four years were exposed to 160 fibers of airborne asbestos due to improper removal techniques, and that (based on the 160 fibers estimated exposure) 29 workers

would develop asbestos related disease at the end of the 15-20 year latency period.

20. In reliance on the Government's evidence the Court found that Salvagno's offense involved a substantial likelihood of death or serious bodily injury to his workers and applied the nine level enhancement under § 2Q1.2(b)(2).

21. The nine level enhancement under § 2Q1.2(b)(2), raised Salvagno's USSG offense level from 30 to 39, and recommended sentence from 108 - 135 months to 262 - 327 months; an increase of 154 - 192 months (or 13-17 years).

22. The 160 fibers and corresponding risk assessment, including the conclusion that 29 workers would develop asbestos related disease upon completion of the latency period, are material facts that dramatically increased Salvagno's sentence and led to judge to impose the unusually severe sentence of 300 months.

23. At that time, Salvagno had no ability to disprove the information presented by the Government (for various reasons, principally that the 15-20 year latency period for asbestos disease has not yet been exhausted, and that there had never been a study of the health effects of asbestos on abatement workers).

24. However, new evidence since Salvagno's 2004 sentence now shows that the information provided by the Government concerning risk of injury to Salvagno's workers (i.e., the 160 fiber count and corresponding risk analysis) was materially erroneous.

25. In particular, records clearly and convincingly show that in the 27 years since the offense conduct commenced in

1990 (beyond the 15-20 year latency period for asbestos) there have been no reported asbestos injuries actually attributable to Salvagno's offense. Exhibit 1.

26. This clearly and convincingly shows that the 160 fiber count and corresponding risk analysis, including the conclusion that 29 workers would have developed asbestos disease or died by this time (which in turn formed the basis of the nine-level enhancement that dramatically increased Salvagno's sentence) were materially inaccurate.

27. When considered in light of all of the evidence in the record (see ¶¶ 67-105 infra, incorporated herein), this new evidence clearly and convincingly demonstrates that no reasonable finder of fact would have determined his offense created the requisite fiber count of airborne asbestos exposures (intensity, frequency and duration) necessary to "result in a substantial likelihood of death or serious bodily injury" to his workers.

28. Thus, Salvagno has showed "by clear and convincing proof that he is actually innocent of the conduct on which his sentence is based". Spence, 219 F.3d at 172.


ii.  Current Unavailability of a Remedy Under § 2255


29. Salvagno's prior § 2255 motion, filed on July 2, 2011, in the US District Court for the Northern District of New York (02-cr-51, Dkt# 879), was denied on the merits (Id., Dkt# 1026).

30. He does not claim innocence of the RICO, Clean Air Act (CAA) & Tax crimes for which he was convicted.

31. Instead, relying on Spence v Superintendent, Great Meadows Corr. Fac., 219 F.3d 162 (2nd Cir 2000), he claims innocence of the conduct, which the sentencing court relied on to find his "offense resulted in a substantial likelihood of death or serious bodily injury", to enhance his sentencing range by nine levels under USSG § 2Q1.2(b)(2).

32. Salvagno's actual innocence claim does not meet the requirements of §§ 2244 and 2255 for leave to file a second or successive motion because it does not (a) rely on new controlling constitutional principles nor (b) present new facts that could lead to a finding that he was not guilty of the crimes for which he was convicted. See §§ 2244 and 2255.

33. Thus, a remedy by a § 2255 motion is unavailable to Salvagno.

### iii. Salvagno's Claim Was Not Available On Direct Appeal Or In His Prior §2255 Motion

34. Salvagno's claim alleges that the actual impact of his offense to his workers at the conclusion of the 15-20 year latency period for asbestos related injury establishes that he is actually innocent of the conduct -- i.e., that 100 of his workers were exposed to 160 fibers, and that based on the 160 fibers, 29 would develop asbestos related disease at the end of the 15-20 year latency period -- which the sentencing Court relied upon to enhance his sentence under § 2Q1.2(b)(2) by nine levels.

35. While the conspiracy for which Salvagno was convicted ended in 1999, the factual predicate of his actual

innocence claim was "inherently unknowable", not capable of being discovered, and in fact non-existent, until after the 15-20 year latency period for asbestos related injury came to completion.

36. As such, the factual predicate for Salvagno's claim did not come into existence until sometime after 2015.

37. Moreover, Salvagno did not learn of the actual result of the impact of his offense to his workers until about April 2017, when he was provided with records establishing there have been no reported asbestos related injuries attributable to his offense conduct. Exhibit 1.

38. When Salvagno filed his direct appeal in 2008, and his original petition for habeas corpus under § 2255 in 2010, the latency period for asbestos related injury had not yet passed and the actual result of the impact of his offense to his workers was was not yet in existence. He therefore could not have raised the actual innocence claim then because the operative facts were not yet in existence.

39. As such, at the time that Salvagno filed his direct appeal and original § 2255 motion, his actual innocence claim was not available.


iv. Serious Constitutional Questions


40. Liberal review of Salvagno's submissions show a facially plausible claim that he is actually innocent of conduct which significantly enhanced his sentence.

41. A remedy by § 2255 motion is inadequate and ineffective because his claim (a) does not satisfy AEDPA's

gate-keeping requirements for second or successive §2255
motions and (b) did not become available until after his
direct appeal and prior § 2255 motion.

42.   As such, serious Eighth Amendment and Due Process
questions would arise if Salvagno were foreclosed from seeking
collateral review on his actual innocence claim. See
Triestman, 124 F.3d at 380.


Why The Issue Presented Herein Was Not Raised On Appeal


43.   The factual predicate for Salvagno's actual
innocence and due process claim did not come into existence
until sometime after 2015, which was after his direct appeal
and prior § 2255 motion. See ¶¶ 14-42, supra; see also ¶¶ 46-
105, infra.


Why The Issue Is Not Otherwise Procedurally Barred


44.   A petitioner may avoid a procedural default for
failing to raise a sentencing claim on direct appeal, "by
showing cause for the default and prejudice, or that failure
to consider the claim will result in a miscarriage of justice,
i.e., the petitioner is actually innocent". Sweet v Bennett,
353 F.3d 135, 141 (2nd Cir 2003).   The Second Circuit has held
that the fundamental miscarriage of justice exception may
apply to sentencing enhancements. Spence, 219 F.3d 171.

45.   In Salvagno's case, the constitutional error
pertains to the fact that he is actually innocent of conduct -
- i.e., that 100 of his workers were exposed to 160 fibers,

and that based on the 160 fibers, 29 would develop asbestos related disease at the end of the 15-20 year latency period -- which the sentencing Court relied upon to enhance his sentence under § 2Q1.2(b)(2) by nine levels.

46. Because Salvagno herein "shows by clear and convincing proof that he is actually innocent of the conduct on which his sentence is based, [his] incarceration is fundamentally unjust and the miscarriage of justice exception to the procedural default bar applies". Spence, 219 F.3d at 172.

47. Alternatively, Salvagno has established cause and prejudice because (a) the factual predicate for his claim did not come into existence until after his direct appeal and (b) the complained of misinformation worked to his actual and substantial disadvantage, infecting his sentence process with errors of constitutional dimensions. Torres v Senkowski, 316 F.3d 147 (2nd Cir 2002).

HABEAS GROUNDS

Ground 1: Salvagno's Sentence Violates Due Process Because
         The Sentencing Court Acted On Information That
         Years Later Turned Out To Be Materially Untrue

A.  Relevant Standard

48. "Due process is violated when the information on which the defendant is sentenced is 'materially untrue' or is, in fact, 'misinformation.'" United States v Lee, 818 F.2d

1052, 1055 (2nd Cir 1986)(citing Townsend v Burke, 334 U.S. 736, 741 (1948)).

49.   "Misinformation or misunderstanding that is materially untrue regarding a prior criminal record, or material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process." King v Hoke, 825 F.2d 720, 724 (2nd Cir 1987).

50.   "For a sentence to be unconstitutional, actual reliance on the erroneous information need not necessarily be shown." King v Hoke, 825 F.2d at 724; see also McGeee v United States, 462 F.2d 243 (2nd Cir 1972)(setting aside sentence after finding sentencing judge's reliance on misinformation was "quite probable"); Id. at 245-46 ("it is impossible to determine from the judge's remarks in imposing sentence ... whether he was at least in part influenced by the [misinformation].  However, certain factors indicate that this is quite probable").

51.   Where a sentence is based on misinformation "[s]uch a result, whether caused by carelessness or design, is inconsistent with due process, and such a conviction cannot stand." Townsend v Burke, 334 U.S. 736 (1948); see also United States v Hollenbeck, 932 F. Supp. 53, 58 (NDNY, 1996)("It does not appear that the [Government] intentionally misrepresented the truth to the court ... From the perspective of what process is due defendant under the Fifth Amendment however, the distinction between a mistake and a lie is of little moment").

B.   Argument

52.   Salvagno's sentence violates due process because the
information on which he was sentenced turned out to be
materially untrue.

53.   The sentencing court relied on the information
provided by the government - i.e., that 100 of Salvagno's
workers who worked for four years were exposed to 160 fibers
of airborne asbestos due to improper removal techniques, and
that (based on the 160 fibers estimated exposure) 29 workers
would develop asbestos related disease at the end of the 15-20
year latency period.

54.   In reliance on the Government's evidence the Court
found that Salvagno's offense involved a substantial
likelihood of death or serious bodily injury to his workers
and applied the nine level enhancement under § 2Q1.2(b)(2).

55.   The nine level enhancement under § 2Q1.2(b)(2),
raised Salvagno's USSG offense level from 30 to 39, and
recommended sentence from 108 - 135 months to 262 - 327
months; an increase of 154 - 192 months (or 13-17 years).

56.   The 160 fibers and corresponding risk assessment,
including the conclusion that 29 workers would develop
asbestos related disease upon completion of the latency
period, are material facts that dramatically increased
Salvagno's sentence and led the judge to impose the unusually
severe sentence of 300 months.

57.   At that time, Salvagno had no ability to disprove
the information presented by the Government (for various
reasons, including that the 15-20 year latency period for

asbestos disease has not yet been exhausted, and that there had never been a study of the health effects of asbestos on abatement workers).

58. However, new evidence since Salvagno's 2004 sentence now shows that the information provided by the Government concerning risk of injury to Salvagno's workers (i.e., the 160 fiber count and corresponding risk analysis) was materially erroneous.

59. In particular, records show that in the 27 years since the offense conduct commenced in 1990 (beyond the 15-20 year latency period for asbestos) there have been no reported asbestos injuries actually attributable to Salvagno's offense. Exhibit 1.

60. This shows that the 160 fiber count and corresponding risk analysis, including the conclusion that 29 workers would have developed asbestos disease or died by this time (which in turn formed the basis of the nine-level enhancement that dramatically increased Salvagno's sentence) were materially inaccurate.

61. Had the sentencing court known that the information provided by the Government was erroneous, the nature and circumstances of Salvagno's offense "would have appeared in a dramatically different light at the sentencing proceeding". See United States v. Tucker, 404 U.S. 443, 448 (1972).

62. Indeed, the sentencing court was erroneously led to believe that Salvagno's offense would have by now caused the death of, or serious bodily injury to, 29 workers, when that was not true, and when none were placed at risk because the fiber level was not what the government claimed it to be.

63. Thus, there is "a reasonable probability to conclude that the [material misinformation] may have led the court to impose a heavier prison sentence than it otherwise would have imposed". Tucker, 404 U.S. at 445-446.

64. Salvagno "was prejudiced for he was sentenced on the basis of assumptions [concerning the 160 fiber and corresponding risk assessment, including that 29 workers would by now be dead or subjected to asbestos disease] which were materially untrue. A sentence predicated on such [misinformation], especially when imposed in the context of other aggravating circumstances, violates due process". United States v Malcolm, 432 F.2d 809, 816 (2nd Cir 1970).

65. The prejudice ensuing from this misinformation and due process violation extends beyond the dramatic impact which increased his sentence by 154-192 months (or 13-17 years).

66. Indeed, the Government continues to not only rely on the misinformation, but embellish upon it (by falsely claiming he placed thousands at risk of asbestos injury) to deny Salvagno the opportunity to obtain a sentence reduction under 18 U.S.C. § 3582 based on extraordinary and compelling circumstances due to the death of his wife - the mother and caregiver of their three minor children. (See ¶¶ 103-104, infra).

C.  Supporting Facts

67. At sentencing, the court found a nine level enhancement was warranted under §2Q1.2(b)(2), based on its finding that Salvagno's offense resulted in a substantial

15

likelihood of death or serious bodily injury to his some of
his co-conspirator abatement workers.

68.  This finding was based on the "expert testimony" of
government witness Dr. Levin, who estimated that 100 of
Salvagno's workers worked for four years under conditions that
exposed them to a total of 160 fibers of airborne asbestos,
and based on the estimated 160 fiber exposure, formed a risk
assessment, which concluded that 29 of those workers would
develop asbestos related injury upon completion of the latency
period. Exhibit 2 (p. 33 & 50-51).

69.  On cross-examination, Dr. Levin admitted that he had
never actually seen asbestos abatement work, never measured
fibers in the air during abatement work, and had no air
monitoring reports or other direct evidence of fiber counts
corresponding to the abatement projects performed by
Salvagno's company. Id.

70.  Dr. Levin further admitted that there has never been
a study conducted to show the health effects of asbestos on
abatement workers. Id (p. 51).

71.  Salvagno called two experts.  The first, Robert
Sheriff, a certified industrial hygienist, with a master's
degree in preventative medicine, who possessed significant
experience and knowledge in epidemiological studies to
determine the relationship between asbestos exposure and risk,
and whose experience with asbestos abatement projects spanned
almost 30 years and more than 4,000 projects. See Exhibit 3
(p. 4-7).

72.  Based on his knowledge, skill, experience, training
and education, including his first hand experience and

reliance on actual test results and studies, Mr. Sheriff testified that Dr. Levin's exposure estimate of 160 fibers over four years was off by a factor of more than 100, and that the actual fiber counts would be 1 or 2 fiber years, which did not create a substantial likelihood of death or serious bodily injury to any Salvagno worker nor even exceed OSHA standards:

Robert Sheriff - Direct (11/10/04 hearing, p. 13)

Q.   Do you have an opinion as to the degree that his [Dr. Levin's] 160 fiber count was in error?

A.   I would say its been a factor of 100 or more overstated. Exhibit 3 (p. 13).

Robert Sheriff - Cross (11/10/04 hearing, p. 119 - 122).

Q.   And you indicated that his [Dr. Levin's] fiber risk was overstated, or asbestos fiber years was overstated by a factor of 100. In other words, he said 160, and you felt it was 1.6, correct?

A.   No. I would say it was more than a factor of 100. I think that was my statement, more than a factor of 100.

Q.   So it wouldn't even be 1.6?

A.   Yes, from my experience I would say probably less than 1.6.

Q.   ... if you had 100 workers that worked for four years or more on friable jobs stripping asbestos without wearing respirators, do you believe that there is a substantial likelihood that even one of those workers will contract asbestos disease?

A.   Well, based on Dr. McDonald's statement, I would say no, it would be less than one.

Q.   So would the same thing apply, let's take an individual example, suppose an individual worked for eight years stripping asbestos dry almost every day, not wearing a respirator, substantial risk with that individual?

A.   Based on Dr. McDonald's statements, it would be less than one.

Q.   Fifteen years?

A.   Still less than one. Exhibit 3 (p. 119 - 122).

Q.   When you did your analysis of what you believed based on your experience was the maximum exposure level that AAR workers could have been exposed to based on all the evidence that you reviewed, the number was whatever it was, one and a half or two, something like that, two fiber years, correct?

A.   Yes.

Q.   So if you were exposed to two fibers per year for twenty years, that would be forty fibers, whether it's chrysotile, amosite, crocidolite, doesn't matter, right?

A.   Yes, that's what the regulation says.

Q.   And the Department of Labor says that's okay right?

A.   Yes.
     Exhibit 3 (p. 128-130).


     73.   Salvagno also proffered the expert testimony of Dr. Peter Barrett, a board certified diagnostic radiologist, board certified nuclear medicine physician, and IR certified B reader, who graduated from Holy Cross with a B.A. in chemistry and pre-med, went to Tufts University to become a M.D., and a diagnostic radiologist, taught at the Massachussets General Hospital, the Harvard Medical School, and Tufts as a clinical professor, where he worked with epidemiologists, industrial medical physicians, occupational medical doctors, and radiologists, and lectured to many different groups about pneumoniosis, the types of asbestos fibers, industrial hygiene, epidemiology, and the history of pneumonconiosis, and has testified on the foregoing areas in 25 to 30 states. See Exhibit 4 (p. 22-24).

     74.   Based on his knowledge, skill, experience, training and education, Dr. Barrett testified that Dr. Levin's exposure

estimate and risk assessment is totally erroneous and groundless, because its based on poor science which did not accurately reflect the conditions or exposure levels at Salvagno's asbestos abatement projects. He further testified that actual comparable studies would demonstrate that exposure to Salvagno's workers was more likely to be closer to 1 or 1.5 fibers per year, as opposed to Dr. Levin's inflated 160 fiber count, and that based on the actual exposure there is NO likelihood that Salvagno's workers would develop asbestos related injury as a result of their work for Salvagno's company:

Dr. Peter Barrett - Direct (11/30/04 hearing, p. 29-35)

Q.  Now, you testified that you read Dr. Levin's testimony in this hearing.

A.  I did, yes.

Q.  And I'm going to ask you to make the same factual assumptions that Dr. Levin made with respect to the activities of AAR workers as he testified to in his testimony. And I'm going to ask you whether you agree with his conclusion that there is a substantial likelihood that workers at AAR will develop lung cancer and/or asbestosis as a result of their work at AAR?

A.  Clearly I completely disagree.

Q.  And would you explain to the Court -- and do you have an opinion as to whether there is a substantial likelihood that workers at AAR will develop lung diseases or asbestos?

A.  I do.

Q.  And what is that opinion, sir?

A.  They will not on the basis of that exposure.

Q.  And will you explain to the Court the reasons for your opinion?

A.  Dr. Levin's assumption of the numbers that I read are based on nothing that I have ever seen in the literature, and I believe that I've read all of the asbestos literature from the 1800s to the

present time. One cannot even guess at exposures unless one has numbers. Most of the literature that has attempted to look at that, who have found that the levels of exposure form such a descriptive work where individuals were working with negative pressure, where they were removing such things as primarily block and pipe covering, that the numbers are literally infinitesimal compared to that, perhaps above .1, but most probably not above 2. His numbers can be substantiated on nothing in the literature and its totally erroneous to use those numbers since they essentially don't exist, and his projections, therefore, in my opinion are groundless.

Q. Did you read in Dr. Levin's testimony that he referred to studies done in Great Britain shipyards and in the hulls of ships for comparison purposes to show how many fibers would be in the air in abatement situations?

A. I did.

Q. And do you have an opinion as to the applicability of those studies to abatements?

A. They're totally inappororiate to be used in the same situation. Dr. Harries' study, Dr. Marr's study, many others in the early days, who looked at several different groups of individuals, most of whom worked in very large shipyards where there was terrible ventilation, where there were hundreds and hundreds of workers simultaneously removing and installing asbestos containing materials ... Others were done on board ships where there was virtually no insulation, the entire ship was covered with spray-on insulation, all of the pipes and boilers were covered. To use those fibers per cc, to try to use that number to look at this totally different situation is scientifically invalid and would be unacceptable by, I think, any epidemiologist.
Exhibit 4 (p. 29-35).

Dr. Peter Barrett - Direct (11/30/04 hearing, p. 63-64)

Q. Okay. Now, has there, to your knowledge, ever been a study of health consequences to abatement workers from exposure to asbestos?

A. Not that I'm, aware of in the literature. No.

Q. You testified that the exposure to these workers at AAR had was more likely to be closer to 1 or 1.5 per year than -- or 3 over a period of time than the 160 that Dr. Levin mentioned. How do you come up with your numbers?

A. I think they're both guestimates, but I believe Dr. Levin's is based on a poor science, he was trying to compare apples and oranges. He is looking at alleged exposures in one factory quite some time ago where there was primarily amosite, where there was no negative air, where there was an awful lot of work going on by multiple different people, and to try to use that to compare to this, I believe, clearly incorrect. Do I know the exact number, no? But certainly in my opinion far more likely to be the one or two than the untenable numbers that he mentioned.

Q. And do you base that opinion on actual studies that you read?

A.  I based that opinion on the fact that, for example, Sawyer and others, while Sawyer certainly found some high doses in the areas where there was not friable material, he found relatively low doses, and again most of the IH [industrial hygienist] data that I have seen that looked at this found relatively low numbers.

Q.  Other than sawyer?

A.  Other than sawyer.
    Exhibit 4 (p. 63-64)

75.  Salvagno also presented the written testimony of Dr. William Rogers, a Board Certified Occupational Medicine Physician who actually examined Salvagno's workers on an annual basis from 1990 to 1999, as required by OSHA. Exhibit 2 (p. 83-84 & Exhibit 205).

76.  Dr. Rogers testified that (a) from 1990-1999, he performed hundreds of examinations on Salvagno's workers, which included chest X-rays and spirometer (pulmonary function) tests to measure lung capacity (b) he reviewed the results of the examinations performed on Salvagno workers and found that he could not recall any difference between those workers and workers from other asbestos contractors and (c) the results of the tests performed on Salvagno workers were consistent with the norm, and not consistent with individuals working in heavy concentrations of dust without the use of any respirators. Id

77.  Salvagno further presented evidence from the NYS Department of Health, who stated that there was no danger to members of the public because "[t]hose living, working or learning in the buildings where asbestos removal work was done improperly are not and have not been exposed to asbestos." Exhibit 5 (p. 9).

78.  The sentencing court, nevertheless, over Salvagno's objections and arguments, credited the Government's evidence and applied the nine level enhancement under §2Q1.2(b)(2).

79.  New evidence, however, obtained after the completion of the 15-20 year latency period shows the government's risk assessment, which the sentencing court relied upon to apply the enhancement, was based on a fiber estimate and assumptions that were materially inaccurate. Exhibit 1.

80.  In this regard, in the more than 27 years since the charged conspiracy commenced in 1990 (beyond the 15-20 year latency period for asbestos related injury) there have been no reported asbestosis injuries actually attributable to Salvagno's offense. Id.

81.  This shows the assumptions made by Dr. Levin concerning the estimated 160 fiber count and corresponding risk analysis (which formed the basis of his risk assessment and conclusion that 29 workers would develop asbestos related injury by this time and corresponding risk estimate, which, the district court relied upon to find that the 9-level enhancement was warranted) were materially inaccurate.

82.  The fact that not one Salvagno worker has developed asbestos related injury, in contradiction to Dr. Levin's testimony, must be viewed in conjunction with the fact that nearly all Salvagno workers smoked cigarettes, which placed them at significantly more risk of developing asbestos related disease than non-smokers, as ex-AUSA Benedict brought out through Mr. Sheriff, Salvagno's expert witness:

Sheriff, Salvagno's expert witness:

Robert Sheriff - Cross (11/10/04 hearing, p. 118-119)

Q.   ... if asbestos workers smoke cigarettes, are they at significantly more risk of developing asbestos related disease than nonsmokers?

A. Yes, they are.

Q. And by what factor?

A. Depending on the study, 30 to 50 times greater possibility.

Q. That's not 30 to 50 percent, that's 30 to 50 times, correct?

A. That's correct.

Q. Do you know what percentage of workers, AAR workers smoked cigarettes?

A. I think I recall something in the testimony or information that predominant, practically all of them were smokers.

Q. 90 percent ring a bell?

A. Yes. Most.
Exhibit 3 (p. 118-119)


83. The evidence of smoking coupled with the materially inaccurate 160 fiber count and risk assumptions, should suggest that at least one of Salvagno's workers should have an asbestos related injury by now, yet none, in the more than 27 years since the offense conduct commenced have asbestos injury.

84. The fact that "most" of Salvagno's workers smoked, yet none developed asbestos related injury, in contradiction to Dr. Levin's estimated 160 fiber count and testimony that by now, 29 workers would have asbestos related illness is not an insignificant factor.

85. The misinformation (concerning the 160 fiber count and corresponding risk assessment) dramatically impacted Salvagno's sentence by raising his recommended guidelines range by 154-192 months (or 13-17 years).

86. At a Criminal History Category of I, the nine level enhancement raised his USSG offense level from 30 to 39, and

his recommended sentencing range from 108 to 135 months to 262 - 327 months.

87.    From the onset, the government painted this case as a murder case, in which "100 of the 500 longest exposed workers have a substantial likelihood of dying or otherwise contracting life threatening disease". Exhibit 6 (p. 5)(citing Government Sentencing Memorandum, 02-cr-51, Dkt 667 at 3).

88.    Salvagno's counsel told the sentencing court that "[i]n order to achieve what Mr. Benedict calls 'the maximum sentence,' Mr. Benedict paints this case as the equivalent of a murder case.  In truth, no one has died, no one has become ill, and despite the crystal ball wielded by the prosecutor's 'experts', there is no hard evidence that anyone ever will become ill or die as a result of defendant's activities". Exhibit 5 (p. 1).

89.    Unfortunately the sentencing court was erroneously led to believe -- by a US Attorney that would later be forced to leave office due to prosecutorial misconduct in an asbestos related prosecution (Exhibit 7) -- the government's misinformation, that many of Salvagno's workers would die upon completion of the latency period and it imposed an unusually severe sentence.

90.    Indeed, Salvagno received the longest sentence in the history of the United States for an asbestos-related offense.

91.    Had the sentencing court known that the information provided by the government was erroneous, the nature and circumstances of Salvagno's offense would have appeared in a dramatically different light.

92.  Objective evidence supporting this position can be found in conclusion reached by Judge Scullen (USDC NDNY) in US v Joseph Thorn (00-cr-99)(NDNY), an asbestos prosecution involving the same prosecutor and expert testimony of Dr. Levin, who, instinctively found that Dr. Levin's testimony was speculative, ruling that "there was too much uncertainty in the evidence, both in terms of available medical evidence, as well as evidence of exposure in the present case." US v Thorn, 317 F.3d 107, 118 (2nd Cir 2003).

93.  At Thorn's 2006 sentencing, the Government claimed Thorn's offense "involved well over 1,000 grossly unlawful asbestos removal projects ... performed over the course of ten years" which created a "virtual certainty of death or serious bodily injury to his workers". Exhibits 8 & 9.  It further claimed his offense was "remarkably similar" to Salvagno's and asked Judge Scullen to impose the same 25-year sentence Salvagno received. Id.  Thorn, however, received a 12-year sentence, Id., which is 13 years less than Salvagno's, despite Thorn having three prior criminal convictions, no mitigating circumstances, and a more serious trial proven offense conduct than Salvagno. Id.

94.  Thorn is the only individual who was sentenced to more than ten years imprisonment for asbestos-related trial convictions in the history of the United States (other than the Salvagnos).

95.  Consider also Andre Parker, convicted by jury trial on 22 felony counts of asbestos-related crimes, involving grossly illegally performed asbestos projects, falsification of thousands of testing samples, illegal dumping of hundreds

of asbestos disposal bags at numerous locations in NY State, and endangerment of his workers. He was sentence by Judge Mordue (USDC NDNY) to 48 months incarceration. Exhibit 10 & 11.

96. Not only has Salvagno's sentence proven disproportionately severe when compared to sentence received by every other similarly situated defendant, it is also strikingly disproportionate to the sentences received by his co-defendants. For instance, Thomas Reed, Salvagno's general manager who had the same charges and relevant conduct as Salvagno, proudly admitted to performing thousands more illegal projects than Salvagno in the two decades before he joined the charged conspiracy, and further admitted he continued to perform illegal projects for a company owned by his wife after having pled guilty, was sentenced to 60 months in prison. Exhibit 12 (p. 15). All other members of the conspiracy were either not indicted, or received sentences of a few months to less than 36 months. Id. (p. 14-19).

97. To put Salvagno's sentence in context, a review of the US Sentencing Commission statistics for 2003, the year closest to Salvagno's sentencing, illustrates how out of proportion his sentence is: the median sentence for (a) murder, i.e., the intentional killing of another human being is 180 months, or 10 years lower than Salvagno's sentence, Exhibit 13; and (b) manslaughter, i.e., the negligent or reckless taking of a human life is 21 months, or more than 276 months lower than Salvagno's. Id.

98. The impact of the misinformation provided by the Government that resulted in Salvagno's unusually severe

sentence must also take into consideration that it led to the
death of Salvagno's wife and destruction of his family.

99. At sentencing, doctors, specialists and persons with
knowledge told the sentencing judge about (a) Alex Jr's severe
and pervasive medical, physical and developmental problems (b)
why the loss of Salvagno's caretaking and financial support
would exceed the harm normally incident to incarceration and
(c) how Salvagno's wife would not be able to take the extreme
pressure, break down and be toppled, if left to care for Alex
Jr., on her own, on top of all of the other parental,
household and financial obligations. Exhibit 14.

100. On November 2, 2014, after years of extreme stress,
depression, frustration, and a dependency to cope with her
situation, Salvagno's wife passed away in her sleep at age 49,
leaving behind their three minor children, who have since been
separated at great distances from each other and Salvagno.
The papers previously filed in this action detail the tragic
circumstances and risk factors impacting the children.

101. The prejudice from the misinformation extends
beyond Salvagno's disproportionately severe sentence and
destruction of his family.

102. Despite knowledge that the information it provided
to the sentencing court, which the sentencing court relied
upon to apply the § 2Q1.2(b)(2) enhancement, was materially
inaccurate, the government continues to not only rely on its
misinformation, but embellish upon it, to deny him the
opportunity to obtain a sentence reduction under 18 USC § 3582
based on extraordinary and compelling circumstances due to the
loss of his wife (the mother and caregiver of their three

minor children).

103.    For instance, in its December 29, 2016 memorandum opposing Salvagno's Prior Petition, the BOP relied and embellished upon the misinformation to deny Salvagno's request for a § 3582 motion, stating that Salvagno's "conduct increased the likelihood of death or serious bodily injury to at least 468 victims", see Exhibit 15, and provided no evidentiary support.

104.    Similarly, in its April 17, 2017, response to Salvagno's Prior Petition in this Court, the US Attorney's Office, and the BOP, relied and further embellished upon the misinformation to claim that Salvagno's offense "put hundreds, if not thousands, of people in danger". Exhibit 16 (p. 22).

105.    Thus, unless the misinformation and ongoing due process violation is redressed (a) Salvagno will continue serving a fundamentally unjust, unusually severe, unconstitutional sentence, substantially enhanced on the basis of misinformation (b) federal agencies will continue to rely on that misinformation to deny relief and benefits to Salvagno and his children and (c) Salvagno will continue to be prejudiced by the stigma attached to creating a likelihood of death to thousands of workers due to materially inaccurate information provided by the government.


Relief Sought


105.    Salvagno requests the Court vacate his sentence and set the matter for resentencing, and alternatively, that counsel be appointed and an evidentiary hearing be held to

develop further evidence as may be necessary to permit the Court to meaningfully engage and fairly resolve the questions raised herein.

107.  "To warrant a hearing on a[ constitutional]  claim, the defendant need establish only that he has a 'plausible' claim ... not that 'he will necessarily succeed on the claim.'" Puglisi v United States, 586 F.3d 209, 213 (2nd Cir 2008)(internal citations omitted).

108.  "The procedure for determining whether a hearing is necessary is in part analogous to, but in part different from, a summary judgment proceeding.  The petitioner's motion sets forth his or her legal and factual claims, accompanied by relevant exhibits ... The district court reviews those materials and relevant portions of the record in the underlying criminal proceeding.  The court then determines whether, viewing the evidentiary proffers, where credible, and the record in the light most favorable to the petition, the petitioner, who has the burden, may be able to establish at a hearing a prima facie case for relief.  If material facts are in dispute, a hearing should usually be held, and relevant findings of fact made." Id.

109.  Second Circuit precedent "disapproves of summary dismissal of petitions where factual issues exist." Pham v United States, 317 F.3d 178, 184 (2nd Cir 2002).

110.  Application of the above authority to the circumstances here makes clear that Salvagno is entitled to an evidentiary hearing to develop further evidence to prove his claims.

## Conclusion

Wherefore, for good cause having been shown the Court should grant the requested relief.

## Verification

I, Alex Salvagno, declare under penalty of perjury pursuant to 28 USC Sec 1746 that the foregoing assertions are true and correct to the best of my knowledge and belief.

Respectfully Submitted

_____

Alex Salvagno